# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Shanea Porter, *et al.*, | ) | CASE NO. 1: 12 CV 1186 |
| | ) | |
| Plaintiffs, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| MC Equities, LLC, *et al.*, | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendants. | ) | |

Plaintiffs Shanea Porter and Lisa Conley have filed a "Collective Action Complaint" against Defendants MC Equities, LLC (MC Equities) and Employers Resource Management, Inc. (Employers Resource) pursuant to the Fair Labor Standards Act (FLSA).  Plaintiffs allege that they were hourly and salaried employees of defendants and that defendants failed to pay them and other similarly situated employees proper overtime compensation as required by the FLSA.

MC Equities has filed a Motion to Stay Proceedings and Compel Alternative Dispute Resolution.  (Doc. 11.)  Employers Resource has filed a Motion to Dismiss and "Joinder in MC Equities' Motion to Compel Alternative Dispute Resolution."  (Doc. 22.)  For the reasons

1

stated below, defendants' motions to compel alternative dispute resolution (ADR) are granted and the case is stayed pending ADR.

**Facts**

Plaintiffs allege the following facts.  MC Equities owns and provides management services to manufactured home communities in Ohio and around the country.  (First Am. Complt., ¶ 6.)  Employers Resource "is a supplier of payroll and other services to MC Equities' employees, including Plaintiffs, in the interest of MC Equities."  (*Id.* at ¶ 9.)  At times relevant to plaintiffs' complaint, "Employers Resource was an employer of Plaintiffs within the meaning of [the FLSA], in that Employers Resource 'act[ed] directly or indirectly in the interest of an employer,' MC Equities, 'in relation to employees,' including Plaintiffs." (*Id.* at ¶ 11.)

Named plaintiffs Shanea Porter and Lisa Conley were employees of defendants.  From approximately July 2010 to the present, "Plaintiff Porter was employed by Defendants as an hourly employee at MC Equities' manufactured home community in Conneaut, Ohio."  (*Id.* at ¶¶ 12, 22.)  From approximately February 2009 to the present, "Plaintiff Conley was employed by Defendants as a salaried Community Manager at MC Equities' manufactured home community in Swanton, Ohio."  (*Id.* at ¶¶ 13, 29.)

In Count One, plaintiffs allege that defendants knowingly and willfully failed to pay Shanea Porter and other similarly-situated hourly employees overtime compensation, at a rate of one and one-half times their regular rate of pay, for hours they worked in excess of 40 hours in a given workweek in violation of the FLSA.  In Count Two, plaintiffs allege that defendants knowingly and willfully violated the FLSA in misclassifying Lisa Conley and

2

other similarly situated salaried employees as "exempt" and by failing to pay Conley and

salaried employees overtime compensation as required by the FLSA.  Plaintiffs also allege

defendants violated the FLSA in failing to keep records of all of the hours worked each

workday "by Plaintiffs and other similarly-situated employees."

Plaintiffs seek to bring the action as an "opt-in" collective action pursuant to 29

U.S.C. §216(b) "on their own and on behalf of all other persons similarly situated who have

been, are being, or will be adversely affected by Defendants' unlawful conduct."  (First Am.

Complt., ¶ 43.)  Plaintiffs seek to represent two classes of similarly-situated persons:  (1) an

Hourly Employee Class; and (2) a Salaried Employee Class.  (*Id.* at ¶ 44.)  "The Hourly

Employee Class which Plaintiff Porter seeks to represent and for whom Plaintiff Porter seeks

the right to send 'opt-in' notices for purposes of the collective action, and of which Plaintiff

Porter herself is a member, is composed of and defined as follows:

> All hourly employees employed by Defendants at MC Equities' mobile home
> communities at any time after May 14, 2009 who were not paid overtime
> compensation at a rate at one and one-half times their regular rate of pay for all
> of the hours they worked over 40 in a workweek.

(*Id.* at ¶ 45.)  The Salaried Class which Plaintiff Conley seeks to represent and for whom

Plaintiff Conley seeks the right to send 'opt-in' notices for purposes of the collective action,

and of which Plaintiff Conley is herself a member, is composed of and defined as follows:

> All salaried Community Managers and Maintenance Supervisors who were
> employed by Defendants at MC Equities' mobile home communities at any
> time between May14, 2009 and the present.

(*Id.* at ¶ 46.)

Five employees of MC Equities have filed consent forms to become party plaintiffs in

the hourly employee class:  James Conley, William Sturgill, Betty Wilson, Roy Allen Slusher,

3

and Tina Hull.  Two employees have filed consent forms to become party plaintiffs in the salaried employee class:  Alice Lundy and Ketina Eastlick .  (Doc. Nos. 11, 29.)

Defendants contend the Court should stay or dismiss the action and compel alternative dispute resolution on the basis of  "Alternate Dispute Resolution Agreements" signed by each of the named and "opt-in" plaintiffs.

**Legal Standard**

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. (the FAA), establishes "a liberal federal policy favoring arbitration agreements."  *Moses H. Cone Memorial Hospital v. Mercury Construction Corp*., 460 U.S. 1, 24 (1983).  Section 2 of the FAA provides:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The Supreme Court has stated that courts must "rigorously enforce agreements to arbitrate."  *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985).  Furthermore, any ambiguity in the parties' contract or doubts about the parties' intentions should be resolved in favor of arbitration.  *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000).  "A party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  *Green Tree Financial Corp-Alabama v. Randolph*, 531 U.S. 79, 91 (2000).

The FAA provides that a court must stay its proceedings if it is satisfied that an issue before it is arbitrable and authorizes the court to issue an order compelling arbitration if there has been a "failure, neglect, or refusal" to comply with an arbitration agreement.

4

*Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (citing 9 U.S.C. §§ 3, 4). 9 U.S.C. § 3 provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

**Discussion**

MC Equities moves to stay the proceedings under § 3 of the FAA because each of the named and "opt-in" plaintiffs signed some version of an "Alternate Dispute Resolution Agreement" at the outset of their employment stating that they agreed to submit all legal disputes arising from their employment to arbitration. MC Equities submits evidence indicating that the plaintiffs and "opt-in" plaintiffs signed agreements containing the following language, or substantially similar language:

> The Employee whose signature is affixed hereto recognize[s] that there are many advantages to using mediation or arbitration to settle any and all legal disputes and claims, including but not limited to, all those arising from or in the course of employment. The Employee agrees that for many reasons, lawsuits and court actions are disadvantageous to both and that the many benefits and advantages to all parties include: speed of process, cost effectiveness, privacy and confidentiality, use of specialized and experienced decision-makers, and complete due process and fairness to all parties.
>
> In consideration of these many benefits, the continuation of the employment relationship, and by other agreements, the parties hereto mutually agree that this document ("Agreement") shall govern resolution of all claims and disputes between them. The parties further agree that this Agreement shall include all such claims and disputes involving Employer's customers and clients, administrative employers, all agents and other employees, all subsidiaries, affiliates and parent companies and any other person or entity that has agreed

5

to this process.

THEREFORE, Employer and Employee agree that any claim or dispute between them or against the persons or entities named above, whether related to the employment relationship or otherwise including those created by practice, common law, court decision, or statute, now existing or created later, including any related to allegations of violations of state or federal statutes related to discrimination and all disputes about the validity of the arbitration clause, shall be exclusively resolved, utilizing a two-step Alternate Dispute Resolution (ADR) process as follows:

1)  First, through mediation utilizing the Rules and Mediator provided by Dispute Systems, Inc. . . . .

2) Failing settlement by mediation, the parties agree that all claims and disputes, including those of jurisdiction and arbitrability, shall be resolved by neutral binding arbitration conducted by the National Arbitration Forum (NAF) . . . .  The parties stipulate that this Agreement involves transactions in interstate commerce,  is subject to the Federal Arbitration Act, invoke its jurisdiction and agree that any award of the arbitrator(s) may be entered as a judgment in any court of competent jurisdiction.

(Exhibits attached to Doc. Nos. 11, 21, and 29.)

Employers Resource joins in MC Equities's motion but contends the Court should dismiss the case entirely rather than simply stay the proceedings, citing to circuit court decisions holding that dismissal is appropriate where all of the issues raised in a case are required to be submitted to arbitration.  *See, e.g. Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000) (quoting *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161 (5th Cir. 1992) ("The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration.")

Plaintiffs oppose both defendants' motions.  Plaintiffs make two main arguments in

6

their opposition to MR Equities' motion.  First, plaintiffs argue that MC Equities is not a "party" to the ADR Agreements because the Agreements nowhere refer to MC Equities but, instead, refer in their letterhead only to Employers Resource.  Therefore, plaintiffs argue MC Equities lacks standing to enforce the ADR Agreements.  Second, plaintiffs argue that they cannot be compelled to arbitrate their alleged claims under the FLSA because the ADR Agreements are silent as to the arbitrability of "collective claims."

Plaintiffs' first argument that MC Equities lacks "standing" to enforce the ADR Agreements appears moot in light of the fact that plaintiffs' amended complaint names both Employers Resource *and* MC Equities as defendants and alleges that plaintiffs were "employed by" both defendants.  (*See* First. Am. Complt., ¶¶ 12, 13.)[1]  According to plaintiffs' own allegations, MC Equities is (and therefore has standing as) an "employer."  Further, plaintiffs do not dispute that Employers Resource has standing to enforce the ADR Agreements, and the Agreements on their face require plaintiffs to submit all claims and disputes related to their "employment relationship" with their "employer" and its "affiliates" to mediation and arbitration.  Plaintiffs' alleged claims against MC Equities fall within the scope of these ADR provisions.  Accordingly, the Court does not find plaintiffs' first argument that MC Equities lacks "standing"  a valid reason to decline to enforce the ADR Agreements.[2]

---

[1]

Plaintiffs' amended complaint was filed after MC Equities filed its motion to stay the proceedings.  Plaintiffs' original complaint named only MC Equities as a defendant.

[2]

MC Equities also asserts in its reply brief that plaintiffs chose to name it as the defendant in their original complaint in an attempt to circumvent the ADR Agreements.  MC Equities asserts that MC Equities is "loosely affiliated" with an Ohio limited liability

To support their second argument that they cannot be compelled to arbitrate their "collective" claims, plaintiffs rely on the Supreme Court's decisions in *Stolt-Nielsen S.A. v. AnimalFeeds Intl. Corp.*, 130 S.Ct. 1758 (2010) and *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011).

In *Stolt Nielsen*, the Supreme Court held that a defendant could not be compelled to submit to "class arbitration" in connection with plaintiff's antitrust claims against it.  The parties in the case had an arbitration agreement which they stipulated was "silent" on the issue of whether it required arbitration of class claims.  The plaintiff brought a class action antitrust suit against the defendant for price fixing.  The parties agreed that they were required to arbitrate their antitrust dispute, but the Supreme Court ultimately had to resolve whether defendant had to submit to class arbitration as sought by the plaintiff.  The Supreme Court held that imposing class arbitration on the defendant was inconsistent with the FAA.  The Supreme Court reasoned that arbitration was a matter of contract, and "bilateral arbitration" which the parties agreed to submit to resolve their disputes was fundamentally different from class arbitration.

---

company called Arrowhead Lake MHP, LLC ("Arrowhead") and that Arrowhead actually "owns and operates the four mobile home parks at which the plaintiffs and potential plaintiffs in [this] litigation are employed." (Affidavit of MC Equities President, Mark Coleman, attached to MC Equities' Reply.)  MC Equities asserts that it "does not pay any of the employees who are presently plaintiffs in this litigation."  Rather, the day to day management of the Ohio mobile home parks at issue . . . rests solely with Arrowhead," and Arrowhead utilizes Employers Resource . . . , a temporary employment agency, to assist in the administration and management of its workforce."  (*Id.* at ¶ 4.) However, whether MC Equities, or Arrowhead, is plaintiffs' actual employer need not be resolved at this point because, as discussed above, plaintiffs' amended complaint alleges that MC Equities is an employer and plaintiffs' claims fall within the scope of the ADR Agreements.

In *Concepcion*, the Supreme Court considered the validity of a California law which invalidated an arbitration agreement expressly prohibiting class claims.  The Supreme Court again stressed that arbitration was a matter of contract and held that the parties' arbitration agreement, which required that claims be brought in an "individual capacity, and not as a plaintiff or class member or representative proceeding" was enforceable under the FAA.

Plaintiffs contend that *Stolt Nielsen* and *Concepcion* demonstrate that they cannot be compelled to submit their "collective" action to arbitration here.  But as MC Equities points out in its reply brief, the holdings in *Stolt Nielsen* and *Concepcion* favor enforcement of individual agreements to arbitrate.  They do not support the proposition that a plaintiff may *avoid* an agreement to arbitrate when they bring claims in a "collective" action.  As MC Equities points out, in *Stolt Nielsen* the parties agreed that plaintiff's antitrust claims were subject to arbitration, but the issue before the Supreme Court was whether the defendant was required to submit to *class* arbitration (and the Supreme Court held that it was not).  The apparent result of the Supreme Court's ruling in *Stolt Nielsen* was that the individual plaintiffs were required to arbitrate their claims individually rather than pursue class arbitration.

In *Concepcion*, the Supreme Court ruled that arbitration agreements must be enforced and that an agreement to disallow class procedures in an arbitration agreement was not a defense to enforcement.

In sum, neither *Stolt Nielsen* nor *Concepcion* support the proposition that plaintiffs need not honor their ADR Agreements requiring them to submit any claims related to their employment to mediation and arbitration.  *Stolt Nielsen* supports the proposition that plaintiffs cannot be compelled to submit to class arbitration, but, as in *Stolt Nielsen*, the impact of this

9

proposition is not that plaintiffs may avoid their ADR Agreements entirely.  Rather, the plaintiffs must submit to individual, rather than collective, arbitration of their claims.

The ADR Agreements state that the plaintiffs agreed to submit any and all claims and disputes related to their employment with defendants to mediation and arbitration.  While the Agreements do not require plaintiffs to submit to class or collective arbitration, they still require plaintiffs to arbitrate individual claims.  Accordingly, pursuant to the FAA and the federal policy favoring arbitration, the Court must enforce plaintiffs' ADR Agreements and compel plaintiffs to submit to arbitration as they contractually agreed.

Although not specifically set out as a separate argument, plaintiffs also dispute in their brief opposing MC Equities's motion that all of the opt-in plaintiffs actually signed ADR Agreements.  MC Equities has submitted copies of ADR Agreements clearly signed by plaintiffs and opt-in plaintiffs Shanea Porter, Lisa Conley, James Conley, William Sturgill, Betty Wilson, Tina Hull, Alice Lundy, and Ketina Eastlick.  (*See* Exhibits to Doc. Nos. 11, 21, 29.)  One of the Agreements contains an illegible signature, and opt-in plaintiff Roy Allen Slusher (the only plaintiff whose name does not legibly appear on one of the Agreements) contends that the signature on this Agreement is not his.  However, MC Equities disputes this and asserts that it is confident discovery will prove that Mr. Slusher, like all of the other plaintiffs, in fact signed the standard ADR Agreement.  MC Equities argues that even if Mr. Slusher did not sign an ADR Agreement, this does not mean that the other plaintiffs are not bound by the terms of their agreements.  MC Equities's argument in this regard is persuasive.  Plaintiffs do not cite authority supporting the notion that the failure of one opt-in plaintiff to sign an arbitration agreement is a reason not to enforce arbitration agreements other plaintiffs

10

signed.  As MC Equities argues, if Mr. Slusher truly believes he did not contractually agree to submit to ADR in connection with his employment with defendants, he is free to file his own action under the FLSA.  As it stands, the case before the Court is brought by representative plaintiffs who signed ADR Agreements.  The fact that Mr. Slusher contends he did not sign the ADR Agreement submitted for him does not establish a reason for the Court to deny MC Equities' motion to compel the plaintiffs who did sign ADR Agreements to submit to arbitration as agreed.

In their opposition to Employers Resource's motion, plaintiffs make the following arguments:  (1) "as explained in Plaintiffs' Opposition to Defendant MC Equities' Motion to Stay Proceedings, the Agreements do not address the arbitrability of collective claims"; (2) defendants have failed to produce signed ADR Agreements for all of the plaintiffs, "so there is no basis to arbitrate the claims of Plaintiff Allen Slusher or any absent Plaintiff"; (3) with regard to the plaintiffs who signed Agreements, Employers Resources "failed to give these plaintiffs the requisite consideration to make the Agreements binding contracts"; (4) and the Agreements are unenforceable "because there was never a knowing and voluntary waiver by Plaintiffs of their right to trial by jury; the Agreements require a fee schedule which has the unlawful 'chilling effect' of deterring litigants from vindicating their statutory rights; and the Agreements are unconscionable adhesion contracts." (Ptlf. Opp. at 5.)

Having disposed of the first two listed bases, the Court turns to the remaining arguments.  First, the Court rejects plaintiffs' argument that the ADR Agreements lack

11

consideration.[3]  In *Dantz v. American Apple Group*, No. 03-4128, 2005 WL 465253, at * 5 (6th Cir. March 1, 2005), the Sixth Circuit held that an agreement requiring arbitration of an employee's dispute with her employer was supported by requisite consideration where, as here, the arbitration agreement also required the employer to arbitrate its claims.  Further, the court held that the employee's "continued employment" with her employer alone was sufficient consideration for an arbitration agreement under Ohio law.  *Id.*

The ADR Agreements here, like the arbitration agreement in *Dantz,* require both parties (the plaintiff employees and the defendant employers) to arbitrate claims and disputes and states that consideration for the agreements includes "the continuation of the employment relationship."  This is sufficient consideration under Ohio law.

The Court also rejects plaintiffs' argument that they did not "knowingly and voluntarily waive" their right to a trial by jury.  The ADR Agreements plaintiffs signed state:

> This is a legal document and questions or concerns about it should be discussed with legal counsel of **Employee**'s choice at his/her expense.  **By signing this Agreement, the parties are giving up any right they may have to sue each other.  Any right to trial by jury or judicial appeal is expressly waived**.

(emphasis in original.)

In evaluating whether a plaintiff has knowingly and voluntarily waived his right to pursue claims in court, a court considers the following factors:  (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to

---

[3]

Ohio law requires consideration for a contract to be enforceable.  *See Harmon v. Phillip Morris, Inc.*, 697 N.E.2d 270, 271 (Ohio App. 1997) (quoting Restatement (Second) of Contracts, § 17 (1981)).

sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances.  *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 668 (6th Cir. 2003) (*en banc*).  In *Morrison*, the court held that a plaintiff knowingly and voluntarily waived her right to pursue employment claims in federal court by signing a "Dispute Resolution Agreement" containing an arbitration clause that required resolution of all disputes and controversies arising out of her employment in an arbitral forum.  The court reasoned plaintiff knowingly and voluntarily waived her right to sue in court because:

> The record shows that Morrison was a highly educated managerial employee who was capable of understanding the terms of the agreement.  Additionally, the waiver of the right to file suit in federal court was plain.  In fact, Morrison does not allege that she did not understand the agreement or that the agreement was unclear.  Finally, as the record shows, Morrison had three days in which to withdraw her consent to the agreement, which advised applicants that they may wish to consult an attorney before signing it.

*Id*.

The waiver language in the ADR Agreements here is explicit.  The Agreements state that the plaintiffs "expressly waived" their right "to trial by jury."  Despite this clear language, plaintiffs argue they did not knowingly and voluntarily waive their right to a jury trial in signing the Agreements because they have "low to mid-level" experience, background, and education.  In addition, they assert that they do not remember signing the ADR Agreements but were given a number of documents by defendants to sign which were not explained to them and they were not given copies of, which defendants instructed them to sign and return immediately without adequate time to review.

13

Plaintiffs rely on *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 383 (6th Cir. 2005).  In *Walker*, the Sixth Circuit upheld the district court's determination that plaintiff-employees did not knowingly and voluntarily waive their rights to file suit in federal court.  However, as Employers Resources argues, *Walker* is distinguishable.  First, the arbitration agreement in *Walker* appeared as part of a twelve-page employment application packet and did not expressly state that plaintiffs were agreeing to waive their rights to trial by jury; whereas here, the ADR Agreements were not buried in lengthy employment application packets.  Rather,  the ADR Agreements are separate, one-page documents, plainly entitled "Alternate Dispute Resolution Agreement."  Further, unlike in *Walker*, the ADR Agreements here expressly state that in signing the Agreements plaintiffs "expressly waived" their rights "to trial by jury."  The district court in *Walker* found the arbitration agreement's waiver provision in that case insufficient because it did not use "commonly understood waiver language about forgoing the right to have claims heard 'at trial' or by 'a jury.'" Instead, the arbitration agreement used language stating that disputes "which would otherwise be decided in court, shall be resolved only through arbitration."  *Id.* at 382.  The ADR Agreements here employ the language the district court in *Walker* found to be more clear and commonly understood.  In addition, unlike here, the *Walker* plaintiffs contended that defendants provided them affirmatively misleading information about the arbitration agreements.  For example, defendant's managers incorrectly told some employees that the arbitration agreement simply meant that if employees had any problems, they had to be handled "in house" or up the employer's "chain of command" first before they could go to an attorney.  *Id.*  Here, there are no assertions that defendants affirmatively mislead plaintiffs about the meaning of the ADR

14

Agreements.  The *Walker* court also found that the arbitration agreement in the case lacked consideration.  As discussed above, the ADR Agreements are supported by requisite consideration.

In sum, *Walker* is distinguishable and does not demonstrate that the plaintiffs did not knowingly and voluntarily waive their right to a jury trial.  Even though plaintiffs assert that they have low to mid-level education, background, and experience and that defendants did not explain the ADR Agreements to them, the Court does not find that plaintiffs did not knowingly and voluntarily waive their right to a jury trial in light of the exceedingly clear language in the ADR Agreements.  Given the clarity of the waiver language in the ADR Agreements, even persons with plaintiffs' level of education, background, and experience should be able to understand that in signing the Agreements, they were agreeing to waive their rights "to trial by jury."  After all, Ohio law presumes that parties to a contract have read its terms.  *See Hadden Co., L.P.A. v. Del Spina*, Case No. 03AP-37, 2003 WL 22006842, at *4, ¶ 15 (Ohio App. 2003) ("One of the most celebrated tenets of the law of contracts is that a document should be read before being signed, and the corollary to this rule is that a party to a contract is presumed to have read what he signed and cannot defeat the contract by claiming he did not read it.")  Moreover, although plaintiffs state that they were instructed to sign and return a number of documents immediately and that the ADR Agreements were not explained to them, there is no contention or evidence that any of the plaintiffs asked for and were refused additional time to read or consider the documents or that defendants made misleading statements.

Plaintiffs next argue that the ADR Agreements are unconscionable and unenforceable

because the fee schedule of the National Arbitration Forum (NAF), the arbitral forum specified in the ADR Agreements, would have a "chilling effect" of deterring a substantial number of potential litigants from seeking to vindicate their statutory rights.  The ADR Agreements themselves make no specific reference to fees.  But the Agreements state that, failing settlement by mediation, the parties claims and disputes shall be resolved by neutral, binding arbitration conducted by the NAF under the "NAF Code of Procedure."  Plaintiffs submit the NAF Code of Procedure as well as an affidavit of counsel who estimates the fees for arbitration that would be incurred by the plaintiffs under the NAF Code.  Counsel asserts that three of the plaintiffs would likely incur $732 in fees under the NAF fee schedule; three of the plaintiffs would incur $5,600 in fees; and two of the plaintiffs would incur $602 in fees. In contrast, the fee to file a case in federal court is $350, and the federal court does not charge additional fees for hearings, motions, and discovery requests.  Plaintiffs contend that they are all low wage earners and that the figures they have submitted demonstrate that the overall cost of arbitration under the NAF Code of Procedure is greater than the cost of litigation in court.[4] They assert that the additional expense of arbitration as opposed to litigation in court renders the ADR Agreements unconscionable in that it would deter potential litigants similarly situated to them from bringing their statutory claims in an arbitral forum.

In *Morrison*, the Sixth Circuit held that "potential litigants must be given an opportunity, prior to arbitration on the merits, to demonstrate that the potential costs of arbitration are great enough to deter them and similarly situated individuals from seeking to

---

[4]

In addition, they submit a chart indicating that, for each of the plaintiffs, the NAF fees would equal three percent or more of their annual pay.

16

vindicate their federal statutory rights in the arbitral forum."  *Morrison*, 317 F.3d at 663.  The

court held that if the reviewing court finds that the cost-splitting provision would deter a

substantial number of similarly situated potential litigants, it should refuse to enforce the cost-

splitting provision in order to serve the underlying purposes of the federal statute."  *Id*.  The

court held that the district court erred in holding the cost-splitting provision in Morrison's

arbitration agreement to be enforceable, reasoning:

> Minimal research will reveal that the potential costs of arbitrating the [Title
> VII] dispute easily reach thousands, if not tens of thousands, of dollars, far
> exceeding the costs that a plaintiff would incur in court.  Courts charge
> plaintiffs initial filing fees, but they do not charge extra for in-person hearings,
> discovery requests, routine motions, or written decisions, costs that are all
> common in the world of private arbitrators.

*Id.* at 669.

Further, the court found that even though the plaintiff could make use of a provision

that would limit her exposure to the greater of $500 or three percent of her annual salary, the

plaintiff would still have to arrange to pay three percent (or, $1,622) of her salary within a

three month period or risk incurring half of her full costs.  *Id*. at 669.  The court found that a

substantial number of similarly situated persons would be deterred from seeking to vindicate

their statutory rights when faced with these circumstances.  Thus, the Court found the cost-

splitting provision in Morrison's arbitration agreement unenforceable.  *Id*. at 670.

Plaintiffs rely on *Morrison* and *Eagle v. Fred Martin Motor Company*, 157 Ohio

App.3d 150 (Ohio App. 2004), in which the Ohio Court of Appeals also found a fee-splitting

provision unenforceable against a low wage earner.  In *Fred Martin*, as here, the arbitration

agreements at issue required the parties to conduct arbitration under the NAF Code of

Procedure.  The *Fred Martin* court assessed the filing fees and likely various other costs to

the plaintiff associated with arbitrating under the NAF Code of Procedure and noted that such

costs were higher than the cost of filing a claim in the Summit County Court of Common

Pleas.  The court found the arbitration costs and fees specified in the NAF Code of Procedure

prohibitive and unconscionable as applied to the plaintiff.  The Court held:

> Assuming arguendo that the NAF Code of Procedure Rules actually provided
> for mandatory full waiver of both Common and Large Claim fees, the fact that
> the rules provide for such a guaranteed waiver for indigent claimants is
> ultimately irrelevant.  Practically speaking, such arbitration costs would serve
> to deter even low-income persons who do not qualify for indigent status, as
> well.  That a consumer such as Ms. Eagle, a primary caregiver for one child
> and who more recently made approximately $20,000 a year, would be willing
> and able to expend on a conservative scale between $4,000 and $6,000 on
> arbitration costs, is highly doubtful.

> Based upon a review of the NAF Code of Procedure, and pursuant to the
> controlling precedent requiring a case-be-case analysis of such clauses, we
> agree with Ms. Eagle and find these arbitration costs and fees are prohibitive,
> unreasonable, and unfair as applied to Ms. Eagle.  Therefore, we conclude that
> based on these prohibitive costs alone, the arbitration clause in general is
> substantively unconscionable.

*Id*. at 171.

*Morrison* and *Fred Martin* are analogous to the facts presented here in regards to the

costs plaintiffs would likely incur in arbitrating their claims under the NAF Code of

Procedure as opposed to litigating them in federal court.  These cases are persuasive to show

that the NAF Code of Procedure fee structure incorporated into the plaintiffs' ADR

Agreements is unenforceable as to the plaintiffs.

Employers Resources does not dispute plaintiffs' calculations of their likely

18

arbitration costs under the NAF Code of Procedure or plaintiffs' assertions as to their income level.  However, Employers Resources argues in its response brief that even if a cost-splitting provision in the arbitration agreement is unenforceable, such a provision is severable from the remainder of the arbitration agreement, which itself should be enforced.[5]

For instance, in *Morrison,* the court held that, in light of the federal policy in favor of arbitration, courts should not lightly conclude that a particular provision of an agreement taints the entire agreement.  The court held that when the agreement at issue includes a "severability provision," the intent of the parties and policy in favor of arbitration dictate that the rest of the agreement should be held enforceable.  *See Morrison*, 317 F.3d at 676 (holding that while cost-splitting and limitation on remedies provisions in arbitration agreement were unenforceable, the provision were severable from the arbitration agreement as a whole).  Employers Resource does not assert that the ADR Agreements contain express severability clauses (and, indeed, a reading of the Agreements indicates that they do not contain such clauses).  However, in *Gannon v. Circuit City Stores, Inc*., 262 F.3d 677, 680 (8th Cir. 2001), the Eighth Circuit stated in *dicta* that it is proper to sever unenforceable provisions from an

---

[5]

Employers Resources also argues that the NAF fee schedule does not render the ADR Agreements unconscionable and unenforceable because the NAF rules provide that a party unable to afford his share of fees may request a waiver of fees and because "there is no evidence the Plaintiffs would be prevented from prosecuting their claim in arbitration."  (Emp. Res. Res. at 12.)  But, as the Ohio Court of Appeals found in *Fred Martin*, the NAF rules do not guarantee a waiver of fees, and the test for determining whether arbitration fees are unenforceable is whether they would deter a substantial number of potential litigants from asserting their claims in an arbitral forum.  *Morrison* and *Fred Martin* indicate that the fees at issue here constitute such a deterrent.  And contrary to Employers Resources's assertion, plaintiffs *have* submitted evidence as to their costs of arbitration according to the fee schedule in the NAF rules.

19

arbitration agreement "[e]ven if the parties had not recorded their intention in a severability provision."  The court reasoned:

> The essence of the contract between Circuit City and Gannon is an agreement to settle their employment disputes through binding arbitration.  The punitive damages clause represents only one aspect of their agreement and can be severed without disturbing the primary intent of the parties to arbitrate their disputes.  'Where one provision in a contract, which does not constitute its main or essential feature or purpose, is void . . . but is clearly separable and severable from the other parts which are relied upon, such other parts are not affected by the invalid provision, and may be enforced as if no such provision had been incorporated in the contract.'

*Id*. at 681.

The ADR Agreements on their face manifest the plaintiffs' agreement to resolve disputes relating to their employment through alternate dispute resolution, rather than trial by jury, according to a two-step alternative dispute resolution process involving mediation and, failing mediation, neutral binding arbitration.  No argument has been made that the fee provisions plaintiffs challenge in the NAF Code of Procedure could not be severed from the ADR Agreements.[6]  Accordingly, pursuant to *Morrison*, the Court finds that the arbitration fee provisions unenforceable as against plaintiffs but hold that they are severable from the other provisions of the ADR Agreements.  Plaintiffs are otherwise required to submit to the ADR process called for in the Agreements.

Plaintiffs' last argument is that the ADR Agreements are unenforceable adhesion contracts.  Plaintiffs assert that the agreements were presented to plaintiffs on a "take it or

---

[6]

Further, no argument has been made that the "mediation" called for in the ADR Agreements is cost prohibitive to plaintiffs.

leave it" basis on standardized, pre-printed forms with no negotiation of any kind such that plaintiffs had no meaningful choice but to sign the Agreements.

The Ohio Supreme Court has recognized that "an arbitration clause in a consumer contract with some characteristics of an adhesion contract necessarily engenders more reservations than an arbitration clause in a different setting"; nevertheless, "even a contract of adhesion is not in all instances unconscionable per se." *Taylor Building Corp. of Amer. v. Benfield*, 117 Ohio St.3d 352, 364 (Ohio 2008).  Rather, in order for an entire contract to be found unenforceable under Ohio law, the contract must be found both substantively and procedurally unconscionable.  The second component, procedural unconscionability, exists when there are "individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible." *Morrison*, 317 F.3d at 666.  Ohio courts look to a number of factors in making this determination, including the age, education, experience and relative bargaining power of the parties, as well as who drafted the agreement and whether the agreement was explained to the weaker party.  But "the crucial question is whether each party to the contract, considering his obvious education or lack of it, had a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print . . . .?" *Id.*

Although the bargaining power between plaintiffs and defendants was certainly not equal in that plaintiffs have mid to low level education and the non-negotiable ADR Agreements were drafted by Employers Resources and not expressly explained to the plaintiffs, the record before the Court shows that the circumstances surrounding plaintiffs' signing of the ADR Agreements were not "procedurally unconscionable."  Despite all of the

21

stated circumstances, the "crucial" inquiry is whether the plaintiffs had a reasonable opportunity to consider and understand the terms of the ADR Agreements.  Plaintiffs here each signed a one-page ADR Agreement which plainly states that in signing it, they agreed to resolve any and all disputes with defendants relating to their employment through alternate dispute resolution rather than in court.  The Agreements state in commonly understood terms that plaintiffs "expressly waived" their rights "to trial by jury" and that the parties were "giving up any right they may have to sue each other."

In short, although plaintiffs assert that they did not have adequate time to review the Agreements and defendants did not explain the Agreements to them, the plaintiffs have not shown that they sought and were denied desired time to consider the Agreements, that defendants made affirmative misrepresentations to them about what they were signing or otherwise "tricked" them into signing the Agreements, or that circumstances were made known to the defendants indicating that plaintiffs were confused or unclear about what they were signing.[7]  Furthermore, other than the fees imposed by the Agreement (which the Court finds unenforceable for the reasons discussed above), the plaintiffs do not challenge any other substantive aspect of the ADR Agreements.  The Court does not find the ADR Agreements as a whole procedurally unconscionable.

---

[7]

Only one plaintiff, Shanea Porter, asserts that she is limited in her ability to read and understand what she reads.  She states in her affidavit that the ADR Agreement was not read or explained to her despite the fact that she has a "comprehension disorder" that makes it "difficult" for her "to understand technical information."  She states that she informed her supervisor, Lynn Granata, of her limitation "the first time" she met with Granata. However, Porter's assertion that she informed Granata of her limitation the first time she met with her does not demonstrate that defendants were aware of Porter's limitation when she was asked to sign and return the ADR Agreement.

22

**Conclusion**

For all of the reasons stated above, defendants' motions to compel arbitration under the FAA are granted because defendants have sufficiently demonstrated the existence of enforceable ADR Agreements.  In accordance with *Morrison*, however, the Court finds that the fee provisions of the NAF Code of Procedure (incorporated by reference into the ADR Agreements) are unenforceable as against plaintiffs and must be severed from the Agreements.  Under the circumstances, the Court finds the case is appropriately stayed pending arbitration rather than dismissed.

Given the Court's determination that the plaintiffs must submit to mandatory mediation and arbitration as called for in the ADR Agreements, plaintiffs' Motion for Conditional Certification, Expedited Opt-in Discovery, and Court-Supervised Notice to Potential Opt-In Plaintiffs (Doc. 13) in litigation is moot.

IT IS SO ORDERED.


/s/ Patricia A.Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 8/30/12

23